**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | |
|---|---|
| _____ ) | |
| Philip D. Sanford, on behalf of himself and all ) | |
| others similarly situated, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. NO: |
| v. ) | |
| ) | **CLASS ACTION COMPLAINT** |
| CEMEX CORP., FLORIDA ROCK ) | |
| INDUSTRIES, INC., HOLCIM (US) INC., ) | |
| LAFARGE NORTH AMERICA, INC., ) | |
| LEHIGH CEMENT COMPANY, OLDCASTLE ) | JURY TRIAL DEMANDED |
| MATERIALS, SUWANNEE AMERICAN ) | |
| CEMENT LLC, TITAN AMERICA LLC, ) | |
| AND VOTORANTIM CIMENTOS NORTH ) | |
| AMERICA, INC. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Plaintiff, Philip D. Sanford, ("Plaintiff"), on behalf of himself, and all others similarly

situated, hereby bring this action to obtain injunctive relief under Section 16 of the Clayton Act,

15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover

damages under Florida antitrust and consumer protection laws and state common law principles

of restitution, disgorgement, unjust enrichment, and to recover the costs of suit, including

reasonable attorneys' fees, against Cemex Corp., Florida Rock Industries, Inc., Holcim (US)

Inc., Lafarge North America, Inc., Lehigh Cement Company, Oldcastle Materials,

Suwannee American Cement LLC, Titan America LLC, and Votorantim Cimentos North

America, Inc., (collectively "Defendants"), for the injuries that Plaintiff and all others similarly

situated sustained as a result of Defendants' violations of those laws.  Plaintiff's allegations as

1

to himself and his own actions are based upon his own knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel. The Defendants have exclusive possession, custody or control of information and documents relating to their conspiracy to fix, raise, maintain and/or stabilize the prices of Portland cement ("Cement") and ready-mix concrete ("Concrete").

## <u>NATURE OF CLAIM</u>

1.      This case arises from an unlawful conspiracy among the Defendants with the purpose and effect of fixing prices, limiting or altering production, and committing other unlawful, unfair and deceptive practices designed to fix, raise, maintain and/or stabilize the prices of Portland cement ("Cement") and ready-mix concrete ("Concrete") in the State of Florida.

2.      As a result of this illegal conspiracy, Defendants charged supra-competitive prices for Cement and Concrete sold throughout the State of Florida, thereby injuring Plaintiff and members of the proposed Classes of indirect purchasers as defined in paragraph 27 and 28 below.

3.      Defendants are the leading manufacturers of Cement and control the Florida Cement market. They conspired to fix and stabilize the prices of Cement at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, among other anticompetitive acts, thus eliminating competition among themselves to the detriment of indirect purchasers of Cement.

4.      Defendants also dominate and control the Florida Concrete market. The primary ingredient of Concrete is Cement. A substantial number of the Concrete producers in Florida are wholly-owned by the Defendant Cement manufacturers. This allowed Defendants to

successfully conspire to fix the prices of Concrete at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, among other anticompetitive acts, thus eliminating competition among themselves to the detriment of purchasers of Concrete.

5.      As a result of Defendants' illegal conduct, Plaintiff and the other members of the Classes suffered economic loss because they paid artificially inflated prices for Cement and Concrete during the Class Period.  Such prices wrongfully exceeded the amount they would have paid if the prices for Cement and Concrete had been determined by a competitive market. Each member of the Classes has suffered related economic harm as a result of Defendants' illegal conduct.

6.      Defendants' conspiracy has involved anticompetitive conduct by a cartel that has economically harmed indirect purchasers throughout the State of Florida.  The conspiracy has affected billions of dollars of commerce throughout the State of Florida and caused related economic loss to each member of the Classes.

7.      The conspiracy has included covert communications during which Defendants expressly agreed to reduce the production and supply of Cement and Concrete and to fix its prices  sold in and/or distributed in Florida.

8.      This action is brought as a class action on behalf of persons that indirectly purchased Cement and Concrete from any of the Defendants between January 1, 2000 and the present.

9.      In Count One of this Complaint, Plaintiff, on behalf of himself and all others similarly situated in Florida, seeks injunctive relief against Defendants based upon allegations of a conspiracy to restrain trade for Cement and Concrete, in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1.

10.     Count Two is brought by Plaintiff seeking damages and other relief on behalf of himself and all others similarly situated in Florida (the "Indirect Purchaser State") for violation of Florida Statute §501.204.

11.     Count Three is brought by Plaintiff on his own behalf and on behalf of the Class members from the State of Florida, seeking a constructive trust and disgorgement of profits from the unjust enrichment of Defendants.

12.     This action is brought as a class action on behalf of persons that indirectly purchased Cement and Concrete from any of the Defendants between January 1, 2000 and the present.

## JURISDICTION AND VENUE

13.     This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.

14.     This Court has jurisdiction under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

15.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c).  Plaintiff resides in this District and Defendants transact business, are found, or have agents in the Middle District of Florida. Further, a substantial part of the events or occurrences giving rise to the claims alleged occurred in the Middle District.

## PARTIES

16.     Plaintiff, Philip D. Sanford, is a resident of Florida, residing in Fort Myers, Florida. During the Class Period, Plaintiff purchased Concrete indirectly from one or more of the Defendants,

including Cemex, and was damaged as a result of Defendants' unlawful conduct.  As a result, Plaintiff paid supra-competitve and artificially initiated prices for Cement and Concrete and has been injured by reason of the illegal conduct alleged herein.

17.    Defendant Cemex Corp. ("Cemex") is a Delaware corporation with its principal place of business in Houston, Texas. Cemex Corp. is a wholly-owned subsidiary of CEMEX, S.A.B. de C.V., a Mexican corporation. Cemex produces and distributes Cement, Concrete, aggregate, concrete block, concrete pipe, and related building materials throughout the United States. Cemex operates three Cement plants, ten Cement import terminals, and approximately 71 Concrete suppliers in Florida. During the Class Period, Cemex sold Cement and Concrete in the State of Florida.

18.    Defendant Florida Rock Industries, Inc. ("Florida Rock") is a New Jersey corporation with its principal place of business in Jacksonville, Florida. Florida Rock is a subsidiary of Vulcan Materials Company, a New Jersey corporation based in Alabama. Florida Rock manufactures and sells construction materials, including Cement, Concrete, aggregates, pre-stressed concrete, and concrete block. Florida Rock operates one Cement plant, two Cement import terminals, and approximately 63 Concrete suppliers in Florida. During the Class Period, Florida Rock sold Cement and Concrete in the State of Florida.

19.    Defendant Holcim (US) Inc. ("Holcim") is a Delaware corporation with its principal place of business in Waltham, Massachusetts. Holcim is a subsidiary of Holcim Ltd., a Swiss company. Holcim manufactures and sells Cement, Concrete, aggregates and asphalt. Holcim operates two Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Holcim sold Cement and Concrete in the State of Florida.

20.    Defendant Lafarge North America, Inc. ("Lafarge") is a Maryland corporation with its principal place of business in Herndon, Virginia. Lafarge is a part of Lafarge Group, a French

entity. Lafarge manufactures and sells Cement, Concrete, gypsum wallboards, aggregates, asphalt, and related products and services. Lafarge operates one Cement import terminal and approximately four Concrete suppliers in Florida. During the Class Period, Lafarge sold Cement and Concrete in the State of Florida.

21.     Defendant Lehigh Cement Company ("Lehigh") is a Delaware corporation with its principal place of business in Allentown, Pennsylvania. Lehigh is a subsidiary of HeidelbergCement Group ("Heidelberg"), a German entity. Lehigh produces Cement, Concrete, aggregates, concrete pipe and block, and pre-cast and pre-stress concrete units throughout North America. In Florida, Lehigh obtains Cement from other manufacturers.  Lehigh also sells Cement under the brand Continental. Lehigh operates three Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Lehigh sold Cement and Concrete in the State of Florida.

22.     Defendant Oldcastle Materials ("Oldcastle") is a Delaware corporation with its principal place of business in Atlanta, Georgia. Oldcastle is a subsidiary of CRH, an Irish corporation. Oldcastle claims to be the leading vertically-integrated supplier of aggregates, asphalt, Concrete and construction and paving services in the United States. Oldcastle partners with American Cement Company to produce and deliver Cement in Florida, and supplies Concrete through its subsidiary, Preferred Materials, Inc. Oldcastle operates one Cement plant and approximately 26 Concrete suppliers in Florida. During the Class Period, Oldcastle sold Cement and Concrete in the State of Florida.

23.     Defendant Suwannee American Cement LLC ("Suwannee") is a Delaware limited liability company with its principal place of business in Branford, Florida. Suwannee's members are Anderson Columbia Company, a Florida corporation, and Votorantim Cimentos,

part of the Brazilian Votorantim Group. Suwannee operates one Cement plant in Florida. During the Class Period, Suwannee sold Cement in the State of Florida.

24.    Defendant Titan America LLC ("Titan") is a Delaware Limited Liability Company with its principal place of business in Norfolk, Virginia. Titan's ultimate parent is Titan Cement Company S.A., a Greek company. Titan produces and sells Cement, Concrete and other building materials in the Eastern United States. Titan operates one Cement plant, one Cement import terminal and approximately 37 Concrete suppliers in Florida. During the Class Period, Titan sold Cement and Concrete in the State of Florida.

25.    Defendant Votorantim Cimentos North America, Inc. ("VCNA") is a Delaware corporation with its principal place of business in Toronto, Canada. VCNA is a subsidiary of Votorantim Group, a Brazilian industrial group. VCNA manufactures and sells Cement, Concrete, and aggregates in North America. VCNA operates approximately 31 Concrete suppliers in Florida through its subsidiary Prestige AB Ready Mix, Inc. ("Prestige"). During the Class Period, VCNA sold Cement throughout the United States and Concrete in the State of Florida.

## UNNAMED CO-CONSPIRATORS

26.    Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following two Indirect Purchaser Classes.

28.    The "Cement Class" is defined as:

All persons or entities who, as end users,  purchased Cement indirectly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present. Excluded from the Florida Cement Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' coconspirators, whether or not named as a Defendant in this Complaint, and government entities.

29.    The "Concrete Indirect Class" is defined as:

All persons or entities who, as end users, purchased Concrete indirectly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present. Excluded from the Florida Concrete Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' coconspirators, whether or not named as a Defendant in this Complaint, and government entities.

30.    Plaintiff does not know the exact number of members of each class at this time.  However, due to the nature of the trade or the commerce involved, Plaintiff believes that the members of each Class are geographically dispersed throughout Florida, and that joinder of all members of each Class would be impracticable.  Plaintiff believes that there are at least hundreds of members of each Class, and that their identities can be learned from Defendants' and their co-conspirators' books and records. Defendants' conduct has seriously injured consumers, businesses, schools, counties and all other members of the Indirect Purchaser Classes.

31.    Plaintiff's claims are typical of those of the Cement Class in that they are indirect purchasers of Cement and their claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

32.    Plaintiff's claims are typical of those of the Concrete Class in that they are indirect purchasers of Concrete and their claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is

common to the Class.

33.    Plaintiff will fairly and adequately protect the interests of the members of each Class and have retained counsel competent and experienced in class action and antitrust litigation.

34.    Common questions of law and fact exist as to all members of each Class, which predominate over any questions affecting solely individual members of each Class. Among the questions of law and fact common to each Class are:

a)    Whether the Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize the prices of, or allocate the market for Cement and Concrete sold in the State of Florida;

b)    The duration and extent of the contract, combination or conspiracy;

c)    Whether the Defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged herein;

d)    Whether the Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

e)    Whether the Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of Cement and Concrete sold in and/or distributed in the State of Florida;

f)    Whether the Defendants and their co-conspirators engaged in conduct that violated state antitrust, unfair competition, and/or consumer protection laws of the State of Florida as alleged herein;

g)    Whether the anticompetitive conduct of the Defendants and their co-conspirators caused

prices of Cement and Concrete to be artificially inflated to non-competitive levels;

h)   Whether the Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Classes;

i)   Whether the Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

j)   Whether Plaintiff and the Classes are entitled to injunctive relief; and

k)   Whether Plaintiff and other members of the Classes were injured by the conduct of Defendants and, if so, the appropriate class-wide measure of damages.

35.    This Class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

a)   It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b)   It would be virtually impossible for all Class members to intervene as parties-plaintiff in this action;

c)   It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d)   As a class action it is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and

e)   It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

36.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief appropriate with

respect to each Class as a whole.

## INTERSTATE TRADE AND COMMERCE

37.      Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Cement in interstate commerce throughout the United States and Florida. Concrete, which has Cement as its primary ingredient, is part of a continuous and uninterrupted flow of transactions and shipments in interstate commerce.

38.      A significant volume of Cement and construction materials was transported into Florida from other states, including Georgia and Alabama, and/or from other countries. The unlawful activities of Defendants and their co-conspirators have been within the flow of interstate and international commerce.

39.      There are two relevant product markets: Cement and Concrete. The relevant geographic market is the State of Florida.

40.      Cement is the major ingredient of Concrete. Since Cement is primarily sold to Concrete producers, demand for both products tends to rise and fall together. In Florida, the changes in consumption of Cement and Concrete paralleled each other during the past five years.

41.      The vast majority of Concrete manufacturers in Florida are wholly-owned subsidiaries of the Defendant Cement manufacturers. The Defendants control their respective wholly-owned subsidiary Concrete companies.

**Cement**

42.      Portland cement, the most common type of Cement, is the primary binding ingredient in a number of construction materials, including Concrete.

43.      Cement is typically sold in bulk by the metric ton, priced in dollars per

metric ton, or in 94 lb. bags, priced in dollars per bag. Due to Cement's high weight and low cost relative to volumes shipped, freight is a significant factor in the price at which Cement is sold.

44.    In Florida in 2008, over 6.4 million metric tons of Cement, valued at approximately $960 million, were produced at seven Cement plants owned and/or operated by Defendants.

45.    In addition to being produced within Florida and elsewhere in the United States, Cement is imported into Florida and the United States from other countries, including China, Canada, Columbia, Mexico and the Republic of Korea, particularly during periods when demand for Cement is high, such as at the peak of the housing boom around 2005.

46.    Due to widespread acquisitions and consolidation, the Florida Cement market is now controlled by a small number of international companies, all of which are Defendants.

47.    In late 2007, Cemex acquired Rinker Materials ("Rinker"), an Australian Cement and construction materials company that had a significant presence in Florida and elsewhere. Following the acquisition, Cemex has become the largest supplier of Cement and Concrete in Florida.

**Ready-Mix Concrete**

48.    Ready-mix concrete is a mixture of Cement, its primary component, and other materials such as sand, gravel and water.

49.    Concrete is produced at batch plants, where the proportions of input materials are measured, combined with water in a rotating drum mounted on a truck, and then mixed in the truck's drum on the way to the construction site. Because the addition of water begins an irreversible chemical reaction, and because the Concrete is poured directly at the

construction site, truck arrival must be timed so that the Concrete hardens at the appropriate time.

50.     The strength of the Concrete is determined by the amount of water added, and is measured in pounds per square inch ("psi").

51.     Concrete is sold by the cubic yard, and is priced in dollars per cubic yard.

52.     Concrete is used principally in commercial, governmental, and residential construction and is purchased by members of the Indirect Purchaser Classes defined in Paragraphs 26 and 27. There are thousands of indirect purchasers in the State of Florida. Absent the unlawful conspiracy, the Defendants' Concrete manufacturing subsidiaries would have competed among themselves and with the ICPs for the sale of Concrete in Florida.

53.     Large projects, such as municipal and commercial construction projects, require Concrete suppliers with significant resources. Suppliers must have access to a large amount of Concrete, as well as the ability to pour significant amounts of Concrete daily, to deliver Concrete of varying strength, to test the Concrete, and to send trucks to the construction site on a continuing basis to complete multiple pours.

54.     Concrete suppliers may also need to provide multiple batch plants in a geographic area, backup plants, many Concrete trucks, a well-trained workforce, the ability to produce Concrete for multiple specifications and large projects, and significant financial backing to remedy construction problems.

## ADDITIONAL FACTUAL ALLEGATIONS

55.     This case involves a conspiracy by Defendants to eliminate competition in the

markets for Cement and Concrete by charging artificially high prices for Cement and Concrete in Florida.

56.     Defendants effectuated their unlawful conspiracy by engaging in the following conduct: (1) agreeing to fix, raise, maintain and/or stabilize prices of Cement; (2) agreeing to fix, raise, maintain and/or stabilize prices of Concrete; and (3) allocating customers and markets, including: (i) allocating Defendants' customers for Concrete; (ii) allocating Defendants' customers for Cement; (iii) allocating ICPs' Customers for Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

57.     Defendants unlawfully conspired and agreed to artificially inflate prices for Cement and Concrete from at least January 1, 2000 to the present (the "Class Period").

58.     Through in-person meetings, telephone, and other communications, Defendants unlawfully agreed, among other things, to the magnitude and timing of price increases of Cement and Concrete and to refrain from competing for each others' Cement and Concrete customers throughout the Class Period.

59.     Defendants regularly met at trade association meetings, events and even corporate meetings that were held at the same time in the same hotel.

60.     Close business and personal relationships among the executives employed by Defendants facilitated the formation and implementation of the conspiracy. For example, Karl Watson, Jr., president of Rinker Materials West and, after the acquisition by Cemex, the Regional President of the Cemex's East Region, was an architect of the conspiracy. Watson is a close associate of one or more officers at each of the other Florida Defendant Cement companies, including Jorge Wagner, President of Prestige/AB Ready Mix, Inc. ("Prestige," a subsidiary of VCNA), Rick Edwards, President of Florida Rock, and Harvey Johnson of Tarmac

America LLC ("Tarmac," a subsidiary of Titan), as well as Robert "Frank" Craddock, Executive Vice President of Commercial for Cemex. These individuals, among others, met on several occasions, including at least once during the Summer of 2008 in the Tampa area.

61.    Defendants' unlawful agreement served several illicit purposes: to fix prices of Cement and Concrete in Florida, and to eliminate Defendants' primary competitors for the sale of Concrete — the ICPs and to injure indirect purchasers.

62.    Defendants fixed, raised, maintained or stabilized Cement prices to noncompetitive, artificial levels in the State of Florida, and price competition among them was eliminated. Not only did Defendants fix the price of Cement through agreement, but also through customer and market allocation.

63.    By allocating customers of Cement, Defendants were able to maintain artificial prices and eliminate cheating by co-conspirators by preventing the purchasers of Cement, primarily the ICPs, from seeking out a better price for Cement from different Defendant manufacturers.

64.    Defendants also fixed, raised, maintained and/or stabilized Concrete prices to non-competitive, artificial levels in the State of Florida, and price competition among them was eliminated. Not only did Defendants fix the price of Concrete through agreement, but also through customer and market allocation.

65.    By allocating customers of Concrete, Defendants were able to maintain artificial prices and eliminate cheating by co-conspirators by preventing the purchasers of Concrete, primarily construction companies, from seeking out a better price for Concrete from different Defendants' wholly-owned concrete subsidiaries.

66.    Defendants' scheme placed the ICPs, who were the principal competitors of the Cement manufacturers' Concrete subsidiaries in Florida and not part of the conspiracy, at a severe competitive disadvantage. Indeed, one of the Defendants' principal purposes of the conspiracy was to eliminate

competition from the ICPs in the Concrete market.

67.    Fixing prices of both Cement and Concrete was an important element of the conspiracy. If they were able to buy Cement at prices set in a free and open market, the ICPs would be able to service customers of Concrete at competitive prices. Accordingly, any attempt by Defendants to collude only on sales of Concrete would be ineffective because the ICPs would be able to undercut the conspirators' prices. Thus, in order to successfully effectuate their conspiracy, Defendants collusively charged the ICPs (and other purchasers) supracompetitive prices for Cement.

68.    Because Cement is the main component of Concrete, by selling Cement to ICPs at artificially-inflated prices, Defendants were able, in effect, to increase prices that the ICPs had to charge their Concrete customers. Defendants' collusion on Cement prices thus kept ICP prices for Concrete artificially inflated and in line with the cartel prices for Concrete that Defendants themselves charged to customers, through their wholly-owned subsidiaries.

69.    Moreover, by artificially inflating the price of Cement to the ICPs, Defendants, through their Concrete subsidiaries, enabled themselves from time to time to offer lower Concrete prices (albeit at collusive levels) to the ICPs' customers, undercutting the ICPs' prices to a point that they could not compete. The purpose was to ultimately drive the ICPs from the market. This scheme permitted Defendants to gain control of an even greater share of the Concrete market in Florida.

70.    In other words, Defendants unlawfully profited from their anticompetitive conspiracy in at least three ways. First, they profited from sales of Cement to customers at collusively-established supra-competitive prices. Second, they profited from sales of Concrete that they supply, through subsidiaries, to their own customers, again, at supra-competitive prices and without competing with each other. Third, insofar as Defendants' conspiracy drove ICPs out of the market entirely, Defendants were able to increase their market share and market power in a particular

territory, and effectively eliminate all remaining price competition. All of these acts resulted in indirect purchasers suffering injury by paying artificially inflated prices.

71.    Defendants met and agreed to artificially raise the prices for Cement and Concrete in Florida by agreeing on the magnitude and timing of price increases. As a result of the Defendants' conspiracy, prices for Cement and Concrete in Florida were fixed, raised, stabilized and/or maintained throughout the Class Period.

72.    Coordinated price increases for Cement and Concrete were regularly announced two times a year, typically in January and July. Each of the Defendants raised the price of Cement and Concrete by about the same amount and at the same time.

73.    For example, in 2008, the collapse of the housing market and the recession severely decreased demand for Concrete in Florida and elsewhere. Pursuant to their unlawful agreement, notwithstanding the substantial reduction in demand, Defendants announced a uniform *increase* in Concrete prices by $25 a cubic yard to $100/cubic yard, a 30% increase, and the elimination of their eight-year-old "fuel surcharge" on Concrete orders:

74.    Subsequent to these price announcements, Defendants implemented the agreed- upon price increases on Concrete sales to customers throughout Florida.

(a)    On August 4, 2008, Cemex announced that, effective October 1, it would increase its Concrete price to existing customers by $25 per cubic yard. Cemex also announced that it was ending its fuel surcharge.

(b)    On August 20, 2008, Tarmac announced a price increase of $25 per cubic yard for Concrete in Florida, thus raising the price to $100 per cubic yard. It also announced that it would add or deduct $5 per cubic yard for each 1000 psi increment, effective September 25, 2008. Like Cemex, Tarmac announced that it was ending its fuel surcharge as well.

(c)    On September 12, 2008, Prestige announced a price increase for Concrete of $25 per cubic yard. It also announced that it would add or deduct $2.50 per cubic yard for each 500 psi increment, effective October 13, 2008. This brought Prestige's Concrete price to approximately $100 per cubic yard. Prestige announced that it was ending its fuel surcharge as well.

75.    Pursuant to their unlawful agreement, Defendants also agreed to fix the price of Cement. For example, in the fall of 2009, Defendants announced the same $15 per ton price increase for Cement in Florida:

(a)    On September 19, 2008, Lafarge issued a price announcement letter to customers signed by its District Sales Manager for Deep South Sales District and VP Marketing and Sales, U.S. East Business Unit, announcing a $15/ton price increase for Cement effective January 1, 2009.

(b)    On October 3, 2008, Cemex sent a letter to customers signed by Frank Craddock, Jr., Executive VP Commercial US Operations, announcing a $15/ton price increase for Cement effective January 1, 2009.

(c)    On October 8, 2008, Continental Florida Materials Inc. (owned by Lehigh) sent a letter to customers announcing a $15/ton price for Cement increase effective January 1, 2009.

(d)    On October 29, 2008, Titan sent a letter to customers announcing a $15/ton price increase for Cement effective January 1, 2009.

76.    Subsequent to their price announcements, Defendants implemented the agreed- upon price increases on Cement sales to customers throughout Florida.

77.    Beginning at least as early as 2000, Defendants also agreed to implement, and in fact implemented, uniform fuel surcharges on shipments of Cement and Concrete, tied to a published index, purportedly to compensate for increasing prices of fuel. However, these surcharges did not correlate directly with the rise and fall of fuel prices, and previously had been simply included in the

price of the Cement that Defendants sold.

78.    Also, in or about 2000, Defendants agreed to implement, and in fact implemented, uniform environmental surcharges on Concrete, purportedly to compensate Defendants for the cost of removing excess Concrete from a work site. Previously, this cost had been incorporated into the price of Concrete. The environmental surcharge was typically approximately $1 per cubic yard.

79.    As a result of Defendants' unlawful price-fixing conduct, Plaintiff and the Classes were injured by paying supra-competitive prices for Cement and Concrete in Florida throughout the Class Period.

80.    In addition to fixing Cement and Concrete prices in Florida through agreements, the Defendants also agreed to allocate customers and territories for Cement and Concrete, which further reduced or eliminated competition and supported their price-fixing agreement. Among the methods Defendants used were: (i) allocating Defendants' customers for Concrete; (ii) allocating Defendants' customers for Cement; (iii) allocating ICPs' Customers for Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

81.    Due to the decrease in demand for Concrete, particularly during the last two years, Defendants also used their allocation scheme to drive ICP's, their primary competitors for Concrete sales, out of the market.

82.    Also as recently as 2008, sales personnel at Cemex were instructed by their superiors to get to know their competitors, and to call competitors to "verify" pricing of Concrete to customers.

83.    Second, Defendants agreed to allocate their customers of Cement, amongst themselves. An ICP seeking to purchase Cement from one of the Defendants would be routinely asked to identify its current Cement supplier, and if the customer requested Cement

from a Defendant who was not the illegally allocated supplier for the Customer's business, the Defendant would refuse to supply the Cement or would offer it at prohibitively high prices.

(a)    In or about 2004, an ICP was refused Cement by Lafarge because it had previously bought from one of Lafarge's competitors.

(b)    On another occasion, one ICP called Cemex to place an order for Cement. The Cemex sales representative stated that it had product available to sell. The Cemex sales representative then the ICP asked who its current supplier was. Upon stating that his current supplier was a competitor Cement supplier, the Cemex sales representative required that the ICP employee speak to a Cemex regional sales manager. The Cemex regional sales manager then told the ICP that Cemex either did not have product to sell, or that Cemex's price of sale was higher than originally quoted, thus forcing the ICP employee to continue to purchase from its existing supplier-Defendant.

84.    Third, Defendants agreed to allocate the ICPs' Concrete customers by territory. For example, in September 2009, Cemex, Florida Rock, Titan (through Tarmac), and VCNA (through Prestige), each agreed to cut their Concrete prices by $4-5 dollars/cubic yard to the customers of ICP's. While offering reduced Concrete prices to ICP's customers, Defendants did not make comparable lower price offers to each other's customers. Further, they agreed that a particular Defendant only target ICP customers in a specific region of Florida:

- Cemex targeted ICP customers on the South Coast and Central region;

- Florida Rock targeted ICP customers in the Jacksonville area;

- Titan targeted ICP customers on the Gulf Coast; and

- VCNA targeted ICP customers in the Orlando area.

85.    Fourth, Defendants, led by Karl Watson, Jr. (Regional President of the Cemex's

East Region), allocated among themselves geographic territories by county in the State of Florida. This is reflected by the fact that different regions in Florida are dominated by individual Defendants, and that Defendants engaged in Cement swaps (as alleged below) with each other rather than forward-integrating and directly competing with each other for Concrete business that is close to their respective Cement plants.

86.    Another mechanism the Defendants used to implement their unlawful agreement is a practice known as a Cement "swap." As described below, this practice was against Defendants' independent economic self-interest and constituted coordinated action in furtherance of the conspiracy.

87.     Equally important, Defendants' swap practices are a means to maintain collusively-established customer and territorial allocations. Although building a new Cement plant is time-consuming and expensive, establishing a Concrete batch plant is much easier. All that is needed is to procure property, trucks and the necessary permits. If Defendants were legitimate competitors of each other, rather than engaging in swap transactions at collusively "discounted" prices, Def B would simply set up its own nearby batch plant (forward integrate) to supply Concrete to customers such as the one whose order triggered the swap. Because Def B's Cement plant would be near its own Concrete batch plant, Def B would have lower transportation costs and be able to undercut Def A on price. Customers in general could recognize the price saving of ordering from Def B, and a competitive marketplace would emerge.

88.     The swap practice operates as a mechanism that Defendants have adopted to support their cartel and the supra-competitive prices that they charge.

89.     A similar practice took place when Defendants supplied each other with Cement for use in products other than Concrete. For example, when Rinker, since acquired by Cemex, purchased Cement from Florida Rock for its materials division, which produced concrete block and other products, Florida Rock invoiced Rinker at the artificially inflated "market" price. But at the end of the year, it credited Rinker with the difference between the inflated price and a lower price that Rinker and Florida Rock had agreed to charge each other for Cement.

90.     In addition to fixing prices and allocating customers and markets, many of the Defendants engaged in other acts to thwart competition in the markets for Cement and Concrete. These included: (i) coordinated supply restrictions; (ii) requiring concrete block

purchasers to also purchase Defendants' Concrete; and (iii) supplying ICPs with inferior cement.

91.     At least some of the Defendants, including Titan, Cemex, and Florida Rock, coordinated supply restrictions. These Defendants increased prices three times within a short time period during an alleged shortage of Cement in the spring of 2004. These price increases occurred in the context of Tarmac (a subsidiary of Defendant Titan) temporarily closing one of its Florida Cement plant to rectify a mechanical problem. The problem allegedly took six months to fix, much longer than typically necessary in the industry. At the time, Tarmac supplied about 10% of the Florida market. While the Tarmac plant was closed, Rinker (later acquired by Cemex) and Florida Rock scheduled maintenance shut downs, instead of delaying the maintenance to satisfy unmet demand. The combined plant shutdowns reduced capacity in Florida by about 33% during much of the second half of 2004. Prices of Concrete increased accordingly.

92.     At least some of the Defendants, including Florida Rock and Cemex, condition the sale of concrete block on the simultaneous purchase of Concrete. Cinder blocks, also known as concrete block, are a widely used building material in Florida. Defendants sell concrete block as well as Concrete, and control the market. During a period of shortage in concrete blocks around 2005, some Defendants refused to sell concrete block to customers unless customers also bought Concrete from Defendants at artificially inflated prices.

93.     When confronted by a concerned employee about the company's involvement in anticompetitive practices in the Cement and Concrete markets, one Defendant, VCNA (at its subsidiary Prestige), actively attempted to conceal the matter.

94.     In or about February 2009, the Prestige employee sent a letter to the U.S. Department of Justice ("DOJ") and to various other federal officials, asserting the existence

of antitrust violations in the Florida Cement and Concrete markets. The employee also provided a copy of the letter to Prestige's general counsel.

95.     Prestige then allegedly began an internal investigation into its conduct. Prestige requested that the employee sign a confidentiality agreement forbidding him from discussing any of the anticompetitive behavior with anyone, except the DOJ, whom he had already contacted. When the employee refused to sign such an agreement, Prestige informed him that he must keep the alleged antitrust investigation confidential.

96.     In order to protect his career and to document what he believed to be anticompetitive conduct, the employee kept notes and collected materials relating to the company's involvement in the unlawful conspiracy.

97.     Around May 2009, the employee was placed on administrative leave, purportedly because he failed to get approval for prices charged on certain projects. The employee was forbidden to speak with any staff, customers, or suppliers of Prestige. Shortly thereafter, the employee resigned.

98.     Shortly after these events, the general counsel for Prestige, who was primarily in charge of the company's internal investigation, left the company.

99.     As a result of Defendants' unlawful conspiracy, prices for Cement and Concrete have been fixed, raised, maintained, and/or stabilized in Florida during the Class Period and indirect purchasers have paid all of the overcharges for Cement and Concrete and there has been a pass-through rate during the class period of over 100%.

100.     For example, the prices of Cement and Concrete in Florida have consistently risen or remained stable since 2000 — even after the end of the housing boom in 2005, the decline in commercial construction, the crash of the economy and the attendant drop in demand for Cement and

Concrete (see chart below). The increases in the price of Cement during this period are even higher when the fuel surcharge is incorporated.

101.    Various other market factors make the Florida Cement and Concrete markets susceptible to anticompetitive practices and unlawful collusion.

102.    Concentration in a particular industry facilitates the operation of a price-fixing cartel because it makes it easier to coordinate behavior among co-conspirators, and it makes it more difficult for customers to avoid the effects of collusive behavior.

103.    The Cement market in Florida is concentrated. At all relevant times during the Class Period, Defendants controlled virtually all of the sales of Cement in Florida.

104.    The Concrete market in Florida is also concentrated. As a result of a series of acquisitions, seven of the Defendants: Cemex, Lafarge, Lehigh, Holcim, Votorantim, Vulcan, and Titan, also own approximately 235 Concrete companies — or approximately 90% of the Concrete companies — in Florida.

105.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

106.    There are significant barriers to entry in the Cement market. Entry requires a company to incur significant start-up capital expenditures. Assuming a suitable location for a Cement plant in close proximity to a source of raw materials could be located, a new entrant into the business would have to incur hundreds of millions of dollars in costs, including those for the

Cement plant and equipment, energy, transportation, distribution infrastructure and labor. Environmental laws increase the time, expense, and planning required.

107.    Although the barriers to entering the Concrete market are not as substantial as those for the Cement market, they are nonetheless significant, requiring substantial start-up capital expenditures and resources for sustained operations. As noted earlier, in order to compete for large projects, a Concrete supplier must be able to provide multiple batch plants in a geographic area, backup plants, many Concrete trucks, a well-trained workforce, the ability to produce Concrete for multiple specifications, the demonstrated ability to handle large projects, and significant financial backing to remedy construction problems.

108.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small, if any, decline in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

109.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

110.    Demand for Cement and Concrete in Florida is highly inelastic. Cement is the primary ingredient in Concrete - it does not have a ready replacement. If there is an increase in the price of Cement, those needing Concrete are not likely to reduce their demand or to substitute other building materials.

111.    Similarly, Concrete is a major and necessary component of commercial, governmental, and residential construction. A small but significant, non-transitory increase in the price of Concrete will not cause construction companies to switch to a different construction material, if such a material is even available and compatible with the needs of a given construction job.

112.    The Department of Justice found the Concrete industry highly inelastic when it challenged an industry merger as anticompetitive, "a small but significant post-acquisition increase in the price of ready mix concrete that meets the bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in sufficient quantities, or to utilize a supplier of ready mix concrete [who would otherwise not be considered a competitor for the business] with sufficient frequency so as to make such a price increase unprofitable." *U.S.* v. *Cemex, S.A.B. de C. V.* Amended Complaint, D.D.C. No. 07-cv006400, at 6-7.

113.    When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

114.    Cement and Concrete are commodities, which are interchangeable across manufacturers. Although construction projects can be bid under various Cement and Concrete specifications, all of the Defendants have the equipment and expertise to meet these specifications.

115. Although demand for Cement and Concrete in Florida has fallen significantly since 2005, average prices for Cement and Concrete in Florida have either increased or remained stable.

116. Cement consumption in Florida peaked in 2005 at 11.2 million metric tons, a rise of 15.8% over the prior year, and then fell each year thereafter. Concrete consumption in Florida also peaked in 2005 at 49.5 million cubic yards, and then fell each year thereafter. Concrete consumption in 2008 was approximately 27.3 million cubic yards, down 21.6% from the prior year.

117. Despite the decrease in demand in Florida for Cement and Concrete in recent years, prices of both products have been stable or increasing. See Tables 1 & 2, ¶194.

118. A felt need to maintain profits in the face of falling demand creates incentives to conspire to fix prices and otherwise to avoid free and open competition.

119. Although shipments of Cement in Florida have decreased significantly since 2005, the price of cement has risen or remained stable.

120. Market factors like those presented here are consistent with anticompetitive conduct and are highly suggestive of collusion.

121. Participation in trade associations can foster and facilitate an unlawful conspiracy. Defendants are members of various trade associations, including the Florida Concrete and Products Association ("FCPA").

122. Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided numerous opportunities to conspire and share information.

123.    In addition, employees in the Cement and Concrete industries frequently move from company to company, further facilitating their communication and strengthening their relationships with their competitors.

124.    During the Class Period, in-person meetings among the Defendants took place before and after industry trade association meetings and related social occasions, frequently shortly before price increase announcements. Some of these meetings include the following:

(a)    The Defendants regularly spoke with each other at meetings of the Florida Concrete and Products Association ("FCPA"), Southeastern Builder Conference ("SBC") and Associated Building Contractors ("ABC"). ABC frequently hosted evening cocktail get- togethers and monthly meetings, at which employees from many of the Defendants met.

(b)    The Voluntary Protection Program Association for Construction ("VPPAC") typically holds its annual meeting, World of Concrete, in Las Vegas, Nevada. The meeting is attended by thousands of industry officers and employees, including executives of the Defendants. The meeting has also been held in Orlando, Florida. At one of the meetings in Orlando, Watson, Wagner, Craddock and Edwards coordinated pricing decision. These and other individuals also stayed at the same hotel during this meeting, including the Peabody Orlando Hotel.

125.    During the Class Period, Defendants also met at private company meetings. For example, Cemex held a company meeting at the West Palm Beach Airport Hilton Hotel. VCNA held a meeting in the same hotel at the same time. While representatives of both companies were at the hotel, Karl Watson, Sr. (then an officer of Cemex) met with Erik Madsen (CEO and President of VCNA) and Jorge Wagner (President of Prestige).

126.    Simultaneous interaction by firms in multiple markets makes collusion easier to

sustain. Multi-market contact can mute market level asymmetries. For example, although a firm with a competitive advantage in one market may be tempted to defect from a price-fixing agreement, it will be deterred from doing so if it knows that another firm would respond in a different market in which that other firm has a competitive advantage. Additionally, multi- market contact increases the frequency of interaction, permitting one firm to discipline another more rapidly than would otherwise be possible.

127.    Defendants are significant players in the Cement and Concrete markets in Florida, as well as in most other states, and in many other countries. This multi-market contact makes it both desirable and feasible for Defendants to sustain collusion in the Florida markets.

128.    Certain Defendants have previously been subject to antitrust fines in Europe, and are currently under investigation by the European Commission ("EC"), among other foreign competition authorities, for their anticompetitive activities in the Cement industry (see below).

129.    The EC has been investigating certain Defendants for about a year for engaging in anticompetitive behavior in the Cement industry. In October 2008, the EC raided the offices of a number of Cement companies, including Cemex, Lafarge, Holcim, and Heidelberg, on suspicion of illegal cartel activity. The EC stated in a press release that it had "reason to believe" that the companies it raided may have violated Articles 81 and 82 of the EC Treaty, which prohibit price- fixing cartels and abuse of dominant position. The investigation seeks to uncover evidence of coordinated price movements, discriminatory pricing and market sharing. The EC has not yet filed formal charges against the companies.

130.    The Spanish offices of Cemex, Holcim, and several other Cement companies were

raided in September 2009 by the EC for suspected price-fixing of Cement.

131.    In June 2009, the South African Competition Commission searched the offices of Cement companies, including Defendant Lafarge, for suspected price-fixing, customer and market allocation, and bid-rigging in the Cement market.

132.    In May 2009, the Mexican competition authority announced an investigation of cartel behavior by Defendant Cemex and other Cement companies.

133.    In December 2008, the Columbia antitrust regulator fined Cement companies, including Defendants Cemex and Holcim, for a conspiracy to fix prices.

134.    In December 2008, twenty Cement executives, including a Lafarge subsidiary executive, were found guilty of price-fixing by the Egyptian antitrust enforcement agency.

135.    In November 2007, Defendant Lafarge Brazil SA paid a fine of approximately $24 million to Brazil's antitrust administrative tribunal, the Council for Economic Defense ("CADE"), for violations of Brazil's competition laws and agreed to changes in its conduct.

136.    In December 2005, Taiwan fined twenty Cement companies, including Cemex, over $6.3 million for antitrust violations.

137.    In August 2005, Argentina fined six Cement companies fines totaling more than $28 million for antitrust violations.

138.    In 2003, the Federal Cartel Office of Germany fined Cement companies, including Defendants Lafarge, Cemex, HeidelbergCement (which controls Lehigh), and Holcim, record-breaking fines of €660 million for engaging in a cartel. Those fines were halved in June 2009.

139.    In 1994, the EC fined Lafarge and other Cement companies for operating a cartel and dividing markets.

140.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators engaged in anticompetitive practices, the purpose and effect of which were to artificially raise, fix, stabilize and/or or maintain the price of Cement and Concrete in the State of Florida. These activities included:

(a)     Attending meetings or otherwise engaging in discussions and communications in Florida and elsewhere in the United States, face-to-face and by telephone, facsimile and electronic mail, regarding the sale of Cement and Concrete in Florida;

(b)     Agreeing during those meetings, discussions and communications to fix, raise, stabilize and/or or maintain the price of Cement and Concrete in the State of Florida;

(c)     Agreeing during those meetings, discussions and communications not to compete for one another's customers, either by refraining from submitting prices or bids to certain customers, and by refusing to provide, or to bid to provide, Cement or Concrete to certain customers;

(d)     Agreeing during those meetings, discussions and communications to allocate the ICPs as Cement customers;

(e)     Agreeing during those meetings, discussions and communications to allocate the Concrete customers of ICPs;

(f)     Agreeing during those meetings, discussions and communications to drive ICPs from the market;

(g)     Exchanging price and customer information regarding Cement and Concrete in Florida with each other;

(h)     Selling Cement and Concrete to customers in Florida at collusive and noncompetitive prices pursuant to the agreement reached;

{00020515.RTF ; 3}

(i)      Accepting payment for Cement and Concrete sold in Florida at collusive and non-competitive prices;

(j)      Authorizing, directing, or consenting to the participation of subordinate employees in the conspiracy;

(k)      Engaging in cement swaps with competitors at collusively "discounted" prices; and

(l)      Concealing the conspiracy and conspiratorial contacts through various means.

141.    Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)      Price competition in the sale of Cement and Concrete has been restrained, suppressed, and/or eliminated in Florida;

(b)      Prices for Cement and Concrete sold by Defendants and their co-conspirators have been fixed, raised, stabilized and/or maintained at artificially high, noncompetitive levels throughout Florida; and

(c)      Class Members who purchased Cement or Concrete indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

142.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the Classes have sustained injury to their business or property in amounts to be proven at trial. The injury sustained by Plaintiff and the Classes is the payment of supra-competitive prices to Defendants for Cement and Concrete during the Class Period. This is an injury of the type that the antitrust laws were meant to

punish, prevent, and redress.

## FRAUDULENT CONCEALMENT

143.    Defendants fraudulently concealed their participation in the conspiracy alleged by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiff, and to each Class. Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiff and the Classes could not have discovered the existence of this conspiracy absent the coming forward of industry participants who have provided relevant information.

144.    Throughout the Class Period, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiff and the Classes to prevent Plaintiff and the Classes from suing them for the anticompetitive behavior alleged in this Complaint.

145.    Defendants wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to, secret meetings, misrepresentations to their Cement and Concrete customers concerning the reasons for increases in the prices of Cement and Concrete and surreptitious communications among Defendants by the use of the telephone, in- person meetings or trade association gatherings (and elsewhere) in order to prevent the existence of written records, limit any explicit reference to competitor pricing communications on documents, and conceal the existence and nature of their competitor pricing discussions from non-conspirators.

146.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

147.    Defendants met and communicated secretly concerning customer and geographic

{00020515.RTF ; 3}

allocation and pricing of Cement and Concrete so as to avoid detection of their illegal conspiracy.

148.    During the Class Period, Defendants repeatedly attributed dramatic price increases to rising fuel and input costs, when in fact these costs did not justify the price increases. These statements were a pretext to conceal Defendants' conspiracy to fix prices of Cement and Concrete.

149.    Defendants' purported reasons for price increases of Cement and Concrete were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.

150.    Plaintiff and members of the Classes reasonably relied on the materially false or misleading explanations by Defendants for increases in the prices of Cement and Concrete, and Plaintiff and members of the Classes were lulled into believing that the increases were the result of normal competitive market forces, rather than the product of collusive activity by Defendants.

151.    Defendants' public statements about the reasons for the price increases were designed to, and did, put Plaintiff and Class members off guard and caused them to accept the increases without undertaking further inquiry. Even had such inquiry been undertaken, it would have proven futile because Plaintiff and members of the Classes did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications for the price increases were valid.

152.    At the time, Plaintiff and members of the Classes considered Defendants' articulated reasons for their price increases during the Class Period to be both normal and legitimate. Accordingly, a reasonable person under the circumstances would not have been

alerted to investigate the legality of Defendants' price increases.

153.    Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature.

154.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until shortly before the filing of this Complaint, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, did not know that they were paying artificially high prices for Concrete and Cement, and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

155.    At all relevant times and in all relevant respects, Plaintiff and other members of the Classes exercised reasonable diligence.

156.    None of the facts or information available to Plaintiff and members of the Classes prior to shortly before the filing of this Complaint, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

157.    As a result of Defendants' conduct and concealment of their conspiracy, Plaintiff and members of the Classes were prevented from suing for the anticompetitive conduct of the Defendants alleged in this complaint until shortly before the filing of this Complaint.

158.    Because of the active steps Defendants took, including fraudulent concealment of their conspiracy, to prevent Plaintiff and members of the Classes from suing them for the anticompetitive activities alleged in this complaint, Defendants are

{00020515.RTF ; 3}

equitably estopped from asserting that any otherwise applicable limitations period has run.

159.    The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiff and members of the Classes as a result of the anticompetitive conduct alleged in this complaint.

## COUNT ONE
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT

160.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint. Plaintiff incorporates by reference the preceding allegations.

161.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

162.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators unreasonably to restrain trade and commerce. In furtherance of the conspiracy, Defendants fixed, raised, maintained, and stabilized prices for Cement and Concrete in the State of Florida, and refrained from competing with each other by allocating customers and geographic territories. Defendants' conspiracy is a *per se* violation of the federal antitrust laws.

163.    Defendants' conspiracy, and resulting impact on the market for Cement and Concrete, occurred in or affected interstate and international commerce.

{00020515.RTF ; 3}

164.    As a direct and proximate result of the illegal contracts, combinations and conspiracies alleged herein, Plaintiff and the members of the Cement Class and Concrete Class were, and continue to be, damaged in their business or property by paying more for Cement and Concrete purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the illegal contracts, combinations and conspiracies.

165.    As a direct and proximate result of the illegal contracts, combinations and conspiracies alleged herein, Plaintiff and the members of the Classes were, and continue to be, damaged in their business or property by paying more for Cement and Concrete purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the illegal contracts, combinations and conspiracies.

166.    These violations are continuing and will continue unless enjoined by this Court.

167.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Cement and Concrete Classed seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT TWO
## (Violation of Florida Statute § 501.204)

168.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants.

169.    This claim is asserted on behalf of the Florida Indirect Purchaser Class.

170.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Cement and Concrete were sold, distributed, or obtained in Florida.

171.    By reason of the foregoing, Defendants engaged in unfair methods of competition, unconscionable acts or practices and unfair or deceptive acts and practices in violation of Fla. Stat. § 501.204.

172.    Defendants' unlawful conduct had the following effects:

a.    Cement and Concrete price competition was restrained, suppressed, and eliminated throughout Florida;

b.    Cement and Concrete prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida;

c.    Plaintiff and members of the Florida Indirect Purchaser Class were deprived of free and open competition; and

d.    Plaintiff and members of the Florida Indirect Purchaser Class paid supra-competitive, artificially inflated prices for Cement and Concrete.

173.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce.

174.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

## COUNT THREE
### (Unjust Enrichment and Disgorgement of Profits)

175.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants.

176.    This claim is asserted on behalf of all the Indirect Purchaser Classes.

177.    Defendants have been unjustly enriched and will continue to be unjustly enriched through overpayments by Plaintiff and the members of the Indirect Purchaser Classes and the resulting profits.

178.    The financial benefits derived by Defendants by reason of their unlawful conduct rightfully belong to Plaintiff and the Indirect Purchaser Classes, as they paid supra-competitive prices during the Class Period, inuring to the benefit of Defendants.

179.    It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which was conferred by Plaintiff and members of the Indirect Purchaser Classes and retained by Defendants.

180.    Plaintiff seeks disgorgement of all ill-gotten profits resulting from Defendants' unlawful, unjust and inequitable conduct.  Plaintiff and the members of the Indirect Purchaser Classes are entitled to the establishment of a constructive trust from which Plaintiff and Indirect Purchaser Class members may seek restitution by making claims on a pro-rata basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

{00020515.RTF ; 3}

1.    Declare that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Classes as defined herein and further order notice of such action to all members of the Classes in the most effective practicable manner;

2.    Find that the Defendants, by participating in the contract, combination and conspiracy alleged herein,

   (i)    acted in violation of Section 1 of the Sherman Act identified in Count One;

   (ii)    acted in violation of the Florida antitrust laws and state consumer protection and unfair competition laws identified in Count Two;

   (iii)    were unjustly enriched as set forth in Count Three.

3.    Enjoin Defendants from continuing the illegal activities alleged herein;

4.    Award Plaintiff and members of the Classes damages as provided by law, including actual damages, multiple damages where provided by law and/or statutory minimum damages where provided by law, and joint and several judgments in favor of Plaintiff and the Classes as provided by law;

5.    Award Plaintiff and members of the Classes restitution on a pro-rata basis, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

6.    Award Plaintiff and the members of the Classes pre-judgment and post-judgment interest on the above sums at the highest rate provided by law;

7.    Allow Plaintiff and members of the Classes to recover their reasonable attorneys' fees and costs as provided by law; and

8.     Grant such other and further relief as this Court deems to be necessary, proper just and/or equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury of all issues triable of right by a jury.

DATED:  November 5, 2009                    Respectfully submitted,

The Plaintiff, Philip D. Sanford

By his attorneys,

/s/ David H. Harris
David H. Harris
(Trial Counsel)
FBN 118850
DAVID HUGHES HARRIS, P.A.
28100 Bonita Grande Drive, Suite 105
Bonita Springs, FL 34135
(239) 898-9050
dhhesq@gmail.com